IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 3, 2025

IN RE LAYTON S.

**Appeal from the Chancery Court for Tipton County**
**No. 38375          William C. Cole, Chancellor**
_____

**No. W2024-00973-COA-R3-PT**
_____

In this case involving termination of a mother's parental rights to her minor child, the trial court found that three statutory grounds for termination had been proven by clear and convincing evidence. The trial court further found that clear and convincing evidence demonstrated that termination of the mother's parental rights was in the child's best interest. The mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JEFFREY USMAN, J., joined.

Patrick B. Treadwell, Memphis, Tennessee, for the appellant, Leah R.

Laurie W. Hall, Memphis, Tennessee, for the appellees, Benjamin S. and Jennifer S.

**OPINION**

I.  Factual and Procedural Background

On September 8, 2023, the petitioners, Benjamin S. and Jennifer S. ("Petitioners"), filed a petition for termination of parental rights and stepparent adoption concerning the minor child, Layton S. ("the Child"), in the Tipton County Chancery Court ("trial court"). Benjamin S. ("Father") is the Child's biological father, and Jennifer S. ("Stepmother") is Father's wife and the Child's stepmother. Petitioners named the Child's mother, Leah R. ("Mother"), as the respondent.

According to Petitioners, the Tennessee Department of Children's Services ("DCS") had filed a petition alleging dependency and neglect of the Child by Mother in the Tipton County Juvenile Court ("juvenile court"), and those proceedings were ongoing. Petitioners averred that Father had been granted temporary custody of the Child by the juvenile court in May 2021, when the Child was seventeen months old, and that the Child had lived with Petitioners continuously since that time.

Petitioners relied upon the following statutory grounds for termination of Mother's parental rights: (1) abandonment by failure to visit the Child, (2) abandonment by failure to financially support the Child, (3) mental incompetence, (4) persistence of the conditions leading to the Child's removal, and (5) failure to manifest an ability or willingness to assume custody of or financial responsibility for the Child. Petitioners further averred that termination of Mother's parental rights was in the Child's best interest. In addition to termination, Petitioners sought an order allowing Stepmother to adopt the Child.

On October 5, 2023, Mother filed a response to the termination petition, asserting that the juvenile court had recently granted her motions seeking visitation with the Child. Mother claimed that Father had rejected her attempts to communicate with him and had failed to cooperate with the juvenile court's visitation order. Mother thus sought dismissal of the termination petition. Mother attached to her response a document demonstrating that she had tested negative for controlled substances on June 23, 2023. Mother also attached a copy of her petition for contempt filed in the juvenile court, wherein she propounded that Father had failed to comply with the juvenile court's August 10, 2023 order granting Mother supervised visitation with the Child.

Petitioners filed a reply acknowledging that the juvenile court had granted Mother visitation with the Child by order dated August 10, 2023. Petitioners denied the other material averments of Mother's pleading, including the allegation that they were in contempt of the juvenile court's order. On November 17, 2023, the trial court entered a scheduling order concerning discovery and trial. The court subsequently entered an order appointing a guardian *ad litem* ("GAL") for the Child.

On January 11, 2024, Petitioners filed a motion requesting that the trial court order Mother to undergo a psychological evaluation pursuant to Tennessee Rule of Civil Procedure 35. In support, Petitioners averred that Mother had a lengthy history of mental instability, which had contributed to the Child's placement in Father's custody. Mother filed a response to the motion, arguing that she had previously submitted to such an evaluation during the juvenile court proceedings. Petitioners filed a reply, stating that Mother had been ordered by the juvenile court to resubmit to a Rule 35 evaluation but had not yet done so.

On March 5, 2024, the trial court entered a consent order memorializing the parties' agreement that Mother would submit to a Rule 35 evaluation to be performed by Dr. Jane

Clement. On March 14, 2024, the trial court entered a separate consent order stating that the former guardian *ad litem* in the juvenile court matter would provide his records to the court under seal for review by the GAL and Dr. Clement.

On April 12, 2024, Mother filed another motion seeking dismissal of the termination petition and an award of attorney's fees. Mother subsequently filed a copy of Dr. Clement's curriculum vitae and the report from Dr. Clement's Rule 35 psychological evaluation. Petitioners moved to strike these documents from the record, positing, *inter alia*, that they were no longer relying on the statutory ground of mental incompetence and that there was "no need for Dr. Clement's Rule 35 psychological evaluation report to be entered into the record." Petitioners also filed a response opposing Mother's motion to dismiss and her request for an award of attorney's fees.

The trial court entered an order on May 7, 2024, granting Petitioners' motion to strike Dr. Clement's affidavit from the record. The court directed that Mother could either call Dr. Clement as a witness at trial or take her deposition. The parties then filed competing pleadings concerning whether Dr. Clement should be permitted to testify as an expert witness.

Meanwhile, the trial court conducted a bench trial in this matter spanning three non-consecutive days: April 17, 2024; May 7, 2024; and May 13, 2024. During trial, the court heard testimony from Father and Stepmother, each of whom testified that Mother had exhibited bizarre and disconcerting behavior during the early part of 2021, including an incident wherein Mother had exhibited a "meltdown" at her home and had physically assaulted Father and one of his friends. Father articulated that he had filed a petition in the juvenile court seeking removal of the Child from Mother's custody following that incident. Father reported that in May 2021, he was contacted by Mother's then-husband, Zach R., who stated that Mother had disappeared with the children, leaving behind their car seats, her wallet, and her phone.[1]

Father testified that DCS had filed a dependency and neglect petition following this incident and that the Child had been placed in Father's custody. Mother was hospitalized in a mental health facility and was later granted supervised visits with the Child. Father stated, however, that Mother's erratic behavior had continued. According to Father, the Child had ingested a piece of plastic during a visit with Mother in March 2022 and had been taken to the emergency room. Father related that when he went to the emergency room to check on the Child, Mother was behaving strangely, speaking quickly and nonsensically, and jumping from a chair to the bed. Father recounted other incidents of strange behavior during that time period such as when Mother had come to Petitioners'

---

[1] Mother has an older son, Zane, from a prior relationship. Zane was also in Mother's custody before the May 2021 incident. Accordingly, references to "the children" relate to the Child and Zane, who was seven years old at the time of trial.

- 3 -

gated living community unannounced, attempting to gain entry, and when Mother had gone to the Child's day care, trying to leave with the Child despite not having the right to do so.

Father also testified that following Mother's subsequent hospitalization in December 2022, he had filed a petition to cease Mother's visitation with the Child. Father stated that Mother had also incurred criminal charges in December 2022 and had sent him unsettling text messages. According to Father, the juvenile court had entered an order at that time directing that Mother have no contact with the Child. Mother did not regain visitation rights until a few days before the termination petition was filed. Father also reported that Mother had not paid any child support for the Child except for a partial payment of the Child's day care tuition for three weeks in 2021.

Father added that he would have concerns about the Child visiting with Mother because her behavior tended to be repetitive and cyclical. Moreover, Father expressed fear that the Child would be injured while he was in Mother's care. Father described the Child as happy, funny, loving, and well-adjusted in Petitioners' household. According to Father, the Child was bonded to Stepmother and his half-brothers, with Stepmother providing a significant amount of the Child's day-to-day care. Father related that Stepmother treated the Child no differently than she treated her biological children. Father also indicated that he had allowed the Child's maternal grandparents to enjoy visits with the Child despite Father's observation that the Child often appeared withdrawn and distant when he returned from such visits.

Stepmother added to Father's testimony that since the birth of Petitioners' two sons, who were ages two years and eight months, respectively, at the time of trial, she had decided to stay home with the three children. Stepmother explained that since Father had gained custody of the Child in May 2021, she had taken on more responsibility for the Child's care. Stepmother related that when the Child first came to live with them, he called her "Mama Jen" but had since begun simply calling her "Mama."

Stepmother echoed Father's testimony regarding Mother's erratic behavior during 2021 and 2022. According to Stepmother, Father had asked for welfare checks to be performed by law enforcement during certain occasions when Mother exercised visits with the Child due to Mother's unpredictable behavior during exchanges. Stepmother also described an incident wherein Mother "Facetimed" Father while Stepmother was present when Mother seemed mentally unstable and failed to "make sense."

Stepmother articulated that she loved the Child as she did her own biological children, explaining that she had been with the Child almost twenty-four hours per day for some time. Stepmother also stated that she would always treat the Child as her own. Stepmother clarified that she wished to adopt the Child and that she understood the attendant responsibility. Stepmother further added that she had attempted to maintain the Child's relationship with his older half-brother with limited success.

Stepmother echoed Father's concerns for the Child's safety if allowed to visit with Mother, including that Mother might kidnap the Child or that the Child might sustain an injury due to Mother's substance abuse or mental health issues. Stepmother remarked that the Child's behavior had improved since he had not had contact with Mother.

Other witnesses who testified on Petitioners' behalf included law enforcement officers, who reported their knowledge regarding Mother's disappearance with the children in May 2021, Mother's criminal behavior in December 2022, Mother's having been found in a field near her home wearing no shoes in the cold, and Mother's walking along the road after midnight wearing only a hospital gown and socks. These incidents occurred during the time period from May 2021 to December 2022, with the exception of an occasion described by Deputy Jimmy Joyner, who indicated that in December 2023, he traveled to Mother's home to serve a warrant for her failure to appear in court. Deputy Joyner stated that he found Mother's home unlocked and unoccupied. As he "cleared the house," Deputy Joyner discovered deposits of dog urine and feces in multiple rooms in Mother's home and described the home's condition as unclean and unsanitary. Deputy Joyner reported that although there was no animal present, he knew that Mother had previously been cited for having dogs running at large. Deputy Joyner further indicated that when he returned the following day, Mother was home and seemed inordinately angry and agitated during her arrest.

The trial court also considered testimony from Morgan B., the current spouse of Mother's former husband, Brandon B., who is the father of Mother's older son, Zane. Morgan B. described her interactions with Mother during 2021 and 2022 and Mother's mercurial and bizarre behavior. Morgan B. stated that Mother had come to their home unannounced on at least two occasions since her husband had been awarded custody of Zane and had exhibited angry and threatening behavior. Although she had not interacted with Mother in recent months, Morgan B. opined that she would be concerned about returning Zane to Mother's custody because Mother's behavioral issues tended to be repetitive. Morgan B. also stated that Zane had expressed great anger when he came to live in their home at age four and had also expressed fear, for which he was participating in therapy.

By contrast, during her trial testimony, Mother denied much of the testimony that had been presented by other witnesses. Although Mother admitted that she had experienced two psychotic episodes due to her Adderall use and had been hospitalized on at least three different occasions, Mother claimed that she had since "graduated" from therapy and knew how to avoid such problems in the future. Mother acknowledged that she still had criminal charges pending from incidents that had occurred in December 2022, but she urged that she was not guilty of the criminal acts with which she had been charged.

- 5 -

When questioned about the cleanliness of her home, Mother replied that her home was "beautiful." Mother explained that she and Zach R. had divorced in March 2023 and that she was currently living with her boyfriend of four to five months. Mother claimed that he interacted well with Zane during visits. Although Mother acknowledged that she had previously experienced an issue with Adderall, she explained that she had completed treatment therefor. Mother admitted having received mental health diagnoses, including "major depressive disorder," "generalized anxiety," and "acute psychotic episode due to Adderall usage." Despite her problems, Mother stated that she had maintained employment during most of 2023 (with different employers) and that she earned a good income. According to Mother, at the time of trial, she was "healthier than she had ever been," and her home was safe and appropriate for the Child. She also propounded that she knew she and the Child still enjoyed a bond even though she had not seen the Child for more than one year.

Mother was administered a drug screen at the conclusion of the first day of trial, and she tested positive for marijuana and alcohol. Despite her past drug and alcohol treatment, Mother appeared to exhibit a somewhat cavalier attitude regarding her use of alcohol and marijuana, explaining that she used marijuana every day or every other day. Mother agreed that the Child was in a stable environment with Father and Stepmother, but she insisted that she believed the Child would be happy to reunite with her. When asked what would happen regarding her marijuana use were she granted visitation, Mother responded that she would not use marijuana when the Child was coming to visit her or during her visit with him.

Dr. Clement was the final witness to testify. She stated that she had performed a Rule 35 evaluation of Mother and explained the tests that had been administered to Mother. According to Dr. Clement, she had also interviewed the parties and six or seven other "collateral" witnesses, in addition to reviewing Mother's mental health records and speaking to the GAL. Based on her examination, Dr. Clement opined that Mother was fit to parent the Child.

During cross-examination, Dr. Clement acknowledged that she had not been asked to perform a custody evaluation. Furthermore, Dr. Clement had not reviewed the DCS or juvenile court records concerning Mother and the Child. Dr. Clement reported that she spoke with Mother in person and by phone and found her to be a "genuine individual who desperately wanted to have time with her son," although she was sometimes "too sarcastic." Dr. Clement stated that she realized that Mother had not been permitted contact with the Child for some time, so she thought Mother's visits should be supervised initially.

Dr. Clement explained that the tests administered to Mother were based on Mother's self-reported responses. Dr. Clement also acknowledged that Mother had not disclosed her regular marijuana use during her interviews with Mother. Dr. Clement agreed that alcohol and marijuana use could exacerbate underlying psychological conditions. According to

- 6 -

Dr. Clement, persons with an unspecified psychotic mood disorder of some kind could go into remission for a period of time and then suffer future periodic reoccurrences.

Following trial, the court entered written findings of fact and conclusions of law on June 7, 2024. In those findings and conclusions, the court determined that the following three statutory grounds for termination had been proven by clear and convincing evidence: (1) abandonment by failure to financially support the Child, (2) failure to manifest an ability or willingness to assume custody of or financial responsibility for the Child, and (3) persistence of the conditions leading to the Child's removal. The court also found that Petitioners had withdrawn the ground of mental incompetence at the beginning of trial and that Petitioners had failed to sufficiently prove the ground of abandonment by failure to visit.

Upon reviewing the statutory best interest factors at extensive length, the trial court concluded that the applicable factors weighed in favor of termination of Mother's parental rights. The court therefore terminated Mother's parental rights to the Child, certifying its order as final pursuant to Tennessee Rule of Civil Procedure 54.02. Mother timely appealed.

## II. Issue Presented

Mother presents the following issue for our review:

Whether the trial court erred in determining that termination of Mother's parental rights was in the Child's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*,

92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> * * *

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2022, to current)[2] lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)    Termination of parental or guardianship rights must be based upon:

(1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)    That termination of the parent's or guardian's rights is in the best interests of the children.

In its final order, the trial court found that clear and convincing evidence supported three grounds for termination of Mother's parental rights: (1) abandonment by failure to financially support the Child, (2) failure to manifest an ability or willingness to assume custody of or financial responsibility for the Child, and (3) persistence of the conditions leading to the Child's removal. Although Mother has not raised any issue on appeal with respect to these grounds, our Supreme Court has instructed that this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on

---

[2] Unless otherwise noted, throughout this Opinion all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the termination petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at \*4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the subsection that was in effect at that time has not changed and therefore remains current.

appeal." *See In re Carrington H.*, 483 S.W.3d at 525-26. Accordingly, we will address each ground in turn.

### A. Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2022, to current), provides in relevant part:

> (g)   Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> > (1)   Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tennessee Code Annotated § 36-1-102(1)(A) (West July 1, 2023, to current) provides the following definition of abandonment as pertinent to the first ground for termination in the instant case:

> For purposes of terminating the . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> > (i)(a)   If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;
> >
> > (b)   If the child is less than four (4) years of age, for a period of three (3) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have

> failed to make reasonable payments toward the support of the child[.]

The trial court determined that clear and convincing evidence supported a finding that Mother had abandoned the Child by failing to support him or make reasonable payments toward his financial support during the four-month period preceding the filing of the termination petition, which period the trial court found began on May 7, 2023, and ended on September 7, 2023. However, because the Child was only three years old at the time of the termination petition's filing, the appropriate time period would be three months preceding the petition's filing or June 8, 2023, through September 7, 2023 ("Determinative Period"). *See* Tenn. Code Ann. § 36-1-102(1)(A)(i)(b); *In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (explaining that the applicable statutory period preceding filing of the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014)). Although the trial court included an additional month within its stated determinative period, we find the trial court's inclusion of an extra month to be harmless error inasmuch as Mother acknowledged during trial that she paid no support during the entirety of 2023.

Although the record contains no court order directing Mother to pay child support, it is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"). We reiterate that the trial court found that Mother had paid no support for the Child during the Determinative Period. Although the court noted that Mother had tendered three payments toward the cost of the Child's day care tuition, the court found that these payments were not made during the Determinative Period. Following our review of the evidence in the record, we conclude that the proof supports the trial court's findings.

Father testified and Mother acknowledged during trial that Mother had tendered no support to Father during the calendar years 2023 or 2024. In fact, the only financial payments that Mother had provided since the Child was placed in Father's custody in May 2021 were three partial payments to the Child's daycare, all of which occurred in 2021.

Moreover, Mother did not plead the defense of lack of willfulness in her answer or via motion. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure."). As such, she waived the absence of willfulness as a defense to the ground of abandonment by failure to support. *See* Tenn. R. Civ. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived); *see also In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *4 (Tenn. Ct. App. May 28, 2021) (finding that a

- 11 -

parent who failed to plead the absence of willfulness in his response to the petition to terminate parental rights waived it as a defense to the ground of abandonment by failure to support). Despite her waiver of this defense, we note that the proof established that Mother was gainfully employed during the Determinative Period.

Based on the proof presented at trial, we conclude that the evidence preponderates in favor of the trial court's determination, by clear and convincing evidence, that Mother had abandoned the Child by failing to financially support him during the Determinative Period. We therefore affirm the trial court's reliance on this statutory ground.

### B. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

The trial court further found, by clear and convincing evidence, that Mother had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (West July 1, 2022, to current) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, Petitioners were required to show by clear and convincing evidence that (1) Mother had failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

When analyzing this ground, the trial court relied upon the following stipulated facts and factual findings by the juvenile court in the related dependency and neglect action:

> The DCS report alleged that the children were drug exposed by [Mother].

> On May 18, 2021, [Mother] had reportedly disappeared with the children, not taking their car seats, her wallet or her cellphone.

> [Mother] and the children were later discovered in a farmer's field in Haywood County.

- 12 -

[Mother] reportedly indicated that she did not remember how she got to the field, but voices had told [her] to run off with the children.

Further, on May 17, 2021, [Mother's] husband, Zach [R.], came home to find a loaded gun on the bed. The gun had previously not been loaded, and [Mother] and the children were the only ones in the home at the time.

Additionally, it has been reported that [Mother] is abusing her Adderall prescription and alcohol.

[Mother] has refused to allow the children's father[s] or family to take custody of the children while she awaits an assessment through Professional Care Services (PCS).

Both the family and children's fathers reported that they had been trying to get [Mother] to seek treatment for the past two (2) days.

[Mother] has had a history of substance abuse.

Attempts by [a DCS representative] to speak with [Mother] were unsuccessful.

[Mother's] behavior was observed to be bizarre and paranoid during the interaction.

[Mother] indicated that she didn't trust anyone when asked if she would agree for the children to go to their fathers or her family.

As to the recent occurrences, [Mother] stated that she had been paranoid recently and didn't know why, and she did not recall being in a farmer's field with the children.

After considering the proof presented during trial, the trial court found that in the months following the incidents described above, Mother "continued to experience bouts of bizarre behavior and Father continued calling for welfare checks." The court also found that in December 2022, Mother broke into the vehicle of Christine P., who found Mother in her car and confronted Mother. Mother was indicted in November 2023 for aggravated criminal trespass and in April 2024 for burglary of a vehicle and theft. In addition, the court determined that Mother was reportedly discovered barefoot in a field in December 2022 and was taken by ambulance to the hospital. A few days later, a law enforcement officer encountered Mother walking down the highway at midnight wearing only a hospital gown and socks. The court found that on December 22, 2022, Mother sent Father several

- 13 -

text messages "that appeared to indicate she was either intoxicated or suffering from a psychotic episode."

The trial court found that Mother had been admitted to a mental health facility on December 26, 2022, and discharged on January 5, 2023, with diagnoses of "unspecified psychotic mood disorder" and "severe Adderall use disorder with psychosis." The court also determined that when an officer traveled to Mother's home to execute an arrest warrant almost a year later, on December 22, 2023, he found the home to be unsanitary with dog urine and feces on the floor in many rooms.

The trial court further found that by the time of trial in April 2024, Mother was residing with her then-boyfriend, whom Mother conceded "maybe" had a criminal record. The court noted that Mother's drug screen conducted on the first day of trial was positive for marijuana and alcohol but negative for all other substances. With regard to drugs, the court found that Mother had admitted her regular marijuana use. The court also found that Mother had failed to pay financial support for the child. Based on the totality of the evidence, the trial court concluded that Mother had failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child.

Upon review, we conclude that the trial court's findings are supported by a preponderance of the evidence. Mother admitted during her trial testimony that she had experienced two mental health crises during the three years preceding trial—one in May 2021 and the other in December 2022—which had resulted in three separate hospitalizations. Although she conceded having struggled with depression since middle school, Mother attempted to blame her mental health struggles on her use of Adderall, which had been prescribed for her and which she claimed made her "paranoid." It was well documented that Mother had abused her Adderall prescription prior to the May 2021 and December 2022 events. Several witnesses testified regarding Mother's extreme behavior surrounding these two events.

The first event, which occurred in May 2021 during a time when Mother maintained custody of her children, involved Mother's disappearance with the children without their car seats, her wallet, or her cellular phone. Mother and the children were eventually located in a field, and they were transported to Professional Care Services, which was described by one witness as a "mental health advoca[cy]" office. Father and Stepmother were then asked to come to that facility. Father testified that Mother would not accept food for herself or the children because she believed they would be poisoned. Father also indicated that Mother was claiming that the children were being molested at their fathers' respective homes. According to Father, DCS initiated paperwork to have the children removed from Mother's custody, and the dependency and neglect petition filed by DCS was entered as an exhibit during the termination trial. Mother acknowledged that she was transported to Western Mental Health Institute at that time for mental health care, which she described as a "good wake-up call." However, Mother denied that the children were exposed to drugs

- 14 -

while in her care or that they had been removed from her care; she instead claimed that she had voluntarily relinquished temporary custody of the children to their respective fathers.

Despite her receipt of mental health treatment and the trial court's grant of visitation to Mother following the May 2021 incident, Mother again began to abuse Adderall. She subsequently experienced another mental health crisis in December 2022. Mother indicated during her testimony that she was arrested "a couple of times" in December 2022, and she described that time period as "a very, very, very bad time." Petitioners presented the testimony of Christine P., who stated that she had discovered Mother breaking into her car in December 2022 and consequently called the police. According to Christine P., Mother left before the officers arrived. Christine P. described Mother as "demanding," "hyped up," "threatening," and "agitated" during their encounter. Christine P. claimed that Mother had also tried to enter Christine P.'s house and "almost ran her over" when Mother was leaving (after Mother realized that Christine P. had contacted the police). Mother denied Christine P.'s characterization of the events, although she acknowledged that she did enter Christine P.'s property. Mother suggested that they merely "had a conversation."

Petitioners provided certified copies of criminal court documents related to two other incidents involving Mother in December 2022. These documents revealed that on December 17, 2022, Mother had "knowingly enter[ed] the motor vehicle of [Nicholaus T.], without the effective consent of the said [Nicholaus T.], with intent to commit theft" and removed property valued at $1,000 or less. Mother was indicted for "burglary of a motor vehicle" and "theft of property under $1,000." Additional criminal court documents evinced that on December 21, 2022, Mother had "unlawfully enter[ed]" the property of Allisa W. without consent, and Mother was therefore indicted for "aggravated criminal trespass." In addition, law enforcement witnesses testified to their interactions with Mother during the same time period when Mother was discovered in a field wearing no shoes during cold weather yet did not seem to experience pain and when Mother was discovered walking along the road after midnight wearing only a hospital gown and socks. During her testimony, Mother again disagreed with the witnesses' version of events, although she did concede that she had entered mental health treatment in December 2022, followed by drug and alcohol treatment.

During trial, Mother claimed to have discontinued her use of Adderall following the December 2022 incidents and her resultant completion of alcohol and drug treatment. However, Mother related that she continued to use marijuana regularly, at least every other day. Mother also acknowledged that she drank alcohol with some regularity and that she had consumed alcohol and used marijuana on the day prior to the start of trial, as demonstrated by her drug test on the first day of trial and despite her daily use of prescribed medications for depression and anxiety, including "Wellbutrin, Hydroxyzine, Lexapro, and Buspar."

Mother related that she had been employed for "almost all" of 2023 and made "good money," although she reported that she had worked for four different employers since January 2023. When questioned regarding child support, however, Mother admitted that she had paid no child support for the Child during the calendar years 2023 or 2024 (to the date of trial). Mother insisted that she did not know how to remit financial support to Father.

When asked about her residence, Mother stated that she was living in a home that was clean and "beautiful" with her boyfriend of a few months' time. Mother noted that her boyfriend might have a criminal record but added that she did not know any details regarding same. Mother also admitted that she had been arrested in December 2023 for failure to appear in court concerning one of her previous charges from December 2022. Mother denied, however, that her home presented dog urine and feces on the floor in December 2023 when the officer entered the home.

Following our thorough review of the evidence presented, we conclude that the trial court properly determined that Mother had failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child. Despite the fact that Mother no longer used Adderall, the evidence established that Mother had clearly failed to remedy her substance abuse problems as evinced by her regular use of marijuana and alcohol. In addition, Mother acknowledged that she no longer attended therapy, and she seemed unable to understand the severity of her exhibited behaviors. Mother also failed to pay financial support to Father. Accordingly, the first prong of this statutory ground was clearly satisfied.

In further support of this ground, Petitioners were required to prove that returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d at 674, 677. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). The trial court also concluded that the "substantial harm" prong relative to this ground had been proven by clear and convincing evidence. Upon our review, we agree.

- 16 -

During her testimony, Mother discounted much of the evidence presented against her. However, in its order, the trial court made significant findings, which were expressly predicated on, *inter alia*, "the [trial court's] observation of the demeanor and assessment of the credibility of the parties and witnesses." The trial court declined to credit Mother's version of many of the events that were described by other witnesses and denied in whole or in part by Mother. Although Mother acknowledged that she had experienced two major mental health crises in recent years and conceded that it would not have been safe for the Child to be with her during those times, Mother urged that she had since "graduated" from therapy and only required monthly meetings with her psychiatrist to regulate her medications. Mother appeared to lack understanding of the gravity of her mental health episodes and the danger she had presented to the Child in May 2021. Mother also failed to comprehend the link between her mental health and abuse of her prescription medication and alcohol. She continued to use alcohol and marijuana on a regular basis. Moreover, Mother lacked appreciation of the trauma that she had likely inflicted on the Child due to her behavior; instead, she postulated that the Child would be happy to be reunited with her despite their lack of contact for more than one year and notwithstanding that the Child was a mere seventeen months old when Mother lost custody.

In addition to the evidence presented regarding Mother's situation, the trial court considered proof regarding the loving relationship between Petitioners and the Child. This Court has previously recognized that removing children from families with whom they have bonded over time and from stable home situations can "pose a risk of substantial harm to the physical or psychological welfare of the [child]." *See In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *12 (Tenn. Ct. App. Apr. 11, 2016) (quoting *State v. C.H.H.*, No. E2001-021-7-COA-R3-CV, 2002, WL 1021667, at *8-9 (Tenn. Ct. App. May 21, 2002)).

Petitioners expressed their great love for the Child and described the close bond the Child shared with them and with his half-brothers. Moreover, Stepmother expressed an unwavering desire to adopt the Child, adding that she considered the Child the same as her own biological children. Stepmother described the family dynamics within their home, indicating that she remained at home with the Child and Petitioners' other children while Father worked. Stepmother related that although Father was "very hands-on," she prepared all of the Child's meals, dressed him, played with him, and assumed responsibility for a substantial portion of his care. Stepmother also indicated that the Child called her "mama." In addition, Stepmother articulated that the Child's behavior had improved since he had not had contact with Mother.

In addition to expressing his loving and close bond with the Child, Father shared significant concern about allowing the Child to have visitation with Mother due to her history of mental instability and drug abuse. Father expressed fear that the Child could be injured while he was in Mother's care due to the behaviors she had exhibited in the past. Father emphasized that he and Stepmother were able to continue providing for the Child's

needs, financial and otherwise, and that the Child was happy and well-adjusted in their home.

Based on the proof presented, we conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that (1) Mother failed to manifest an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. We therefore affirm the trial court's reliance in its termination order on the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

### C. Persistence of Conditions Leading to the Child's Removal

Tennessee Code Annotated § 36-1-113(g)(3)(A) (West July 1, 2022, to current) provides as an additional ground for termination:

The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Concerning the focus of this statutory ground, this Court has explained:

The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." [*In re Audrey S.*, 182 S.W.3d,] 874 [(Tenn. Ct. App. 2005)]. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring

- 18 -

environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

*In re Kaisona B.*, No. W2020-01308-COA-R3-PT, 2021 WL 4319624, at *6 (Tenn. Ct. App. Sept. 23, 2021). "Under this [persistence of conditions] ground, a parent's inability to eliminate such conditions does not need to be willful." *In re Braden K.*, No. M2020-00569-COA-R3-PT, 2020 WL 5823344, at *9 (Tenn. Ct. App. Sept. 30, 2020) (citing *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012)).

The trial exhibits demonstrate that the juvenile court entered an adjudicatory order on September 15, 2021, finding the Child to be dependent and neglected in Mother's care. The juvenile court's order also included findings that the conditions leading to the Child's removal included, *inter alia*, Mother's use of drugs while caring for the Child; Mother's "bizarre and concerning behaviors" leading up to the filing of the dependency and neglect petition on May 21, 2021; Mother's disappearance with the children; Mother's simultaneous abuse of Adderall and alcohol; and Mother's mental health.

By the time of trial, approximately three years following the Child's removal, Mother had experienced yet another "psychotic episode" in December 2022 induced by her abuse of Adderall. Mother had incurred multiple criminal charges during that episode and had again participated in mental health treatment in addition to drug and alcohol treatment. However, Mother continued to consume alcohol in addition to her prescribed medications, and Mother also used marijuana on a regular basis. Moreover, although Mother described her situation as stable by the time of trial, the evidence established that she had been living with a boyfriend whom she had only known for a short time, she had been employed at four different jobs since January 2023, she still had pending indictments and had been arrested for failure to appear in court in December 2023, she resided in a home that had been described as unsanitary by the arresting officer in December 2023, and she had failed to provide regular financial support for the Child. Most importantly, however, Mother failed to accept responsibility for her situation or for losing custody of the Child. Instead, Mother chose to blame her situation on others or on various circumstances that she inferred were outside her control.

We reiterate that the ultimate issue with reference to this ground is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). Although Mother suggested at trial that she was prepared to exercise have some form of visitation with the Child, neither Mother, Dr. Clement, nor any other witness testified that the Child could be safely returned to

Mother's custody at that time or in the near future. Based on the evidence presented, we conclude that there is little likelihood that the conditions leading to removal or other conditions that would likely cause the Child to be subjected to further abuse or neglect would be remedied "at an early date so that the child can be safely returned to the parent or guardian in the near future." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). We therefore conclude that the evidence preponderates in favor of the trial court's determination, by clear and convincing evidence, that the conditions leading to the Child's removal persisted, and we affirm the trial court's reliance on this statutory ground for termination of Mother's parental rights.

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i)(1) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2022, to current) lists the following factors for consideration:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must

remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final order, the trial court considered each of the twenty best interest factors that it found applicable and determined that most of them weighed in favor of terminating Mother's parental rights to the Child. Upon our thorough review of the evidence, we conclude that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

Concerning factor (A), relative to the Child's "critical need for stability and continuity of placement," the trial court determined that termination of Mother's parental rights "would allow [the] Child to promptly remain in his current safe and stable environment without exposure to either Mother's mental [health] issues, her domestic situation and/or her substance use and abuse." The evidence supports these findings. In addition, Petitioners expressed that the Child had integrated well into their family and that

they and their other children enjoyed a close bond with him. Stepmother voiced her desire to adopt the Child and testified that she provided a majority of his care. There was no dispute that the Child was thriving while in the care of Petitioners and that he referred to Stepmother as "Mama." For these reasons, we agree with the trial court that factor (A) weighs in favor of termination. For the same reasons, we determine that the evidence preponderates in favor of termination as to factor (B), which relates to the effect a "change of caretakers and physical environment" would have on the Child's overall well-being. The Child had resided with Petitioners since he was seventeen months old and was closely bonded to them and to their other children. Meanwhile, the Child had not visited with Mother for more than a year by the time of trial.

Regarding factor (C), the trial court found that Mother had "failed to demonstrate continuity and stability in meeting [the] Child's basic material, educational, housing, and safety needs" because Mother had abused Adderall in the Child's presence, had failed to prioritize the Child in her "current living arrangement and choice of activities," and had failed to pay financial support for the Child for at least three years. Accordingly, the trial court determined that this factor weighed in favor of termination of Mother's parental rights. Upon review, we find that the evidence preponderates in favor of the trial court's findings regarding this factor.

As to factor (D), the trial court determined that there was a dearth of evidence demonstrating a "secure and healthy parental attachment" between Mother and the Child. The court noted that although Mother's visitation with the Child during the latter part of 2021 and also during 2022 was supervised, Mother had presented no proof concerning the activities or behavior that occurred during those visits, other witnesses' observations of the visits, or any other evidence to demonstrate that a healthy parent-child bond existed. In fact, the only evidence presented concerning the Child's visitation with Mother was Stepmother's testimony that the Child's behavior had improved once he no longer had contact with Mother. The court further questioned whether a healthy parental attachment could be created because the Child had not seen Mother in more than a year and also because of Mother's "lack of insight of the need for basic support, her lifestyle decisions, and her propensity for substance use."

Regarding the related factor (E), concerning whether the parent has maintained regular visitation or other contact with the child to cultivate a positive relationship with the child, the trial court found that there had not been regular visitation or other contact between Mother and the Child due to Mother's abuse of Adderall that caused her to lose custody, Mother's persistent Adderall abuse that led to a second bout of psychosis, and Mother's delay in seeking a reinstatement of visitation. The evidence preponderates in favor of the trial court's findings regarding these factors. Accordingly, we agree with the trial court that both factors (D) and (E) weigh in favor of termination of Mother's parental rights.

- 24 -

Factors (F) and (G) relate to the Child's previous experiences in the parent's home and any trauma resulting from those experiences. Here, the trial court made no findings concerning these factors. We note that the Child was quite young when he was removed from Mother's custody and that no evidence was presented that the Child suffered from fear or trauma as a result of any experience in Mother's home.

This Court has recently examined the applicability of factors (F) and (G) when the child has never lived in the parent's home or when no evidence concerning the factors has been presented at trial. *See In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9-10 (Tenn. Ct. App. Jan. 21, 2025). The mother in *Colten* conceded that the child had not had contact with her since he was removed from her custody shortly after birth, but she argued that the trial court had erred in finding factor (F) to be inapplicable because the fact that the child did not recognize her would mean that he was not fearful of living in her home. *Id.* at *9. The *Colten* Court noted that this Court had affirmed the trial court's finding that the two factors were neutral in *In re Bentley R.*, No. W2023-01665-COA-R3-PT, 2024 WL 3443817, at *11 (Tenn. Ct. App. July 17, 2024), when the mother had argued that factors (F) and (G) "should have weighed in her favor in the absence of proof that the child at issue was fearful." *Id.* (also citing *In re Azelea B.*, No. M2023-00656-COA-R3-PT, 2024 WL 657652, at *23 (Tenn. Ct. App. Feb. 16, 2024); *In re Riley B.*, No. E2022-00684-COA-R3-PT, 2023 WL 3477216, at *11 (Tenn. Ct. App. May 16, 2023)). Summarizing case law regarding factors (F) and (G) since the enactment of the current best interest factors, this Court explained:

> In another case, we deemed factor (F) "inapplicable" where a child had never lived in the parental home. *See In re Tayla R.*, No. M2024-00248-COA-R3-PT, 2024 WL 4950106, at *21 (Tenn. Ct. App. Dec. 3, 2024) ("DCS concedes that factor (F), regarding a child's fear of living in the parental home, is inapplicable since the Child never lived in Mother and Legal Father's home. For their part, Foster Parents argue that factor (F) applies and weighs in favor of termination. We agree with DCS as to the inapplicability of factor (F)[.]"). We have deemed factor (F) inapplicable in many other cases as well. *See, e.g.*, *In re Lilah G.*, No. E2023-01425-COA-R3-PT, 2024 WL 3825077, at *10 (Tenn. Ct. App. Aug. 15, 2024) (agreeing with the trial court that factor (F) did not apply because there was no proof regarding it presented at trial); *In re Elizabeth Y.*, 2024 WL 3738701, at *15 (noting that the trial court "omitted any reference" to factor (F) presumably finding it inapplicable, and agreeing that it "would weigh neither for nor against termination" because the child never resided in the home); *In re Logan F.*, No. M2023-01280-COA-R3-PT, 2024 WL 3534932, at *12 (Tenn. Ct. App. July 25, 2024) (finding factor (F) inapplicable where the court heard no testimony regarding whether the child would be fearful of living in the home); *In re Quentin G.*, 2024 WL 3324105, at *7 (same); *In re Zoey O.*, No. E2022-00500-COA-R3-PT, 2023 WL 3222699, at *14 (Tenn. Ct. App. May

3, 2023) ("The trial court also found that the factors set forth in Tennessee Code Annotated section 36-1-113(i)(1)(F) and (G) do not apply in the present case. The record supports these findings."); *In re Joseph D.*, No. M2021-01537-COA-R3-PT, 2022 WL 16848167, at *23 (Tenn. Ct. App. Nov. 10, 2022) ("Like the juvenile court, we find that factors (F), (G), and (S) are inapplicable. There was only one incident at an in-person visit at Mother's home which resulted in Joseph becoming confused and upset. There was no evidence that Joseph would fear living in Mother's home[.]"); *but see In re Ethan W.*, No. E2024-00318-COA-R3-PT, 2024 WL 4600451, at *19 (Tenn. Ct. App. Oct. 29, 2024) (concluding that factor (F) weighed against termination where there was no proof regarding that factor); *In re Freddy P.*, No. E2023-00042-COA-R3-PT, 2024 WL 660195, at *12 (Tenn. Ct. App. Feb. 16, 2024) ("there was no proof as to whether the child was fearful of living in Mother's home, which weighs against termination"); *In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) ("DCS's failure to submit sufficient proof as to a factor does not necessarily mean that the factor is inapplicable").

*In re Colten B.*, 2025 WL 252663, at *10. The *Colten* Court deemed factor (F) neutral in that case, but the Court also determined that because the mother had demonstrated no relationship at all with the child, any mislabeling of this single factor represented harmless error. *Id.* at *10.

In this case, the trial court made no findings as to factors (F) and (G). Mother, however, offered testimony indicating the Child's lack of fear and trauma, and Petitioners failed to introduce countervailing evidence as to these factors. Under these circumstances, we conclude that these factors weigh against termination.

Regarding factor (H)—whether the child has created a healthy parental attachment with another person or persons in the absence of the parent—the trial court found that this factor weighed in favor of termination because the Child had bonded with Stepmother and "created a healthy relationship" with her, referring to her as "Mama." The court noted that the Child had been in Petitioners' custody since he was seventeen months old. By contrast, the court found that the Child "has experienced either limited or no contact with Mother for effectively half of his life and for the periods when Mother and Child had contact, the quality of the interaction would necessarily have been adversely impacted by Mother's substance abuse." We agree with the trial court's findings. The evidence was clear that the Child had bonded with Stepmother, having spent two-thirds of his life in her care. The evidence preponderates in favor of the trial court's findings as to factor (H).

The trial court determined that factor (I) weighed in favor of termination as well. The trial court found that the Child had "emotionally significant" relationships with his half-siblings in Petitioners' home and "would be negatively impacted by a severance of

those relationships." The court also found that Petitioners had tried to maintain the Child's relationship with his older half-brother. The court made no finding regarding the Child's "access to information about the child's heritage." However, the evidence demonstrated that Petitioners had encouraged and facilitated the Child's relationship with his maternal grandparents. Accordingly, the evidence preponderates in favor of the trial court's findings as to factor (I).

The trial court determined that factor (J) weighed in favor of termination because Mother had not "demonstrated a lasting adjustment of circumstances, conduct, or conditions that make it safe and beneficial for Child to be in her home." The court noted that Mother had admitted her regular use of marijuana as well as her regular use of alcohol, despite taking prescription medication that was contraindicated by alcohol. The court found that this practice was "not only potentially dangerous for her, it evidence[d] a blatant disregard for the health, well-being and best interest of the Child." The evidence preponderates in favor of the trial court's findings concerning factor (J).

The trial court found that factor (K), concerning whether the parent had taken advantage of available programs or services, and factor (L), concerning whether DCS had made reasonable efforts to assist the parent in making a lasting adjustment, did not apply in this matter. We agree. Although DCS was initially involved in the dependency and neglect matter in juvenile court, DCS's involvement appears to have been limited.

The trial court determined that factor (M), concerning whether the parent had demonstrated a sense of urgency in addressing her circumstances, weighed in favor of termination because Mother waited six months after her release from mental health treatment in January 2023 to petition the juvenile court for a reinstatement of her visitation. The trial court noted that Mother did not appear for a juvenile court hearing held on January 18, 2023, and that the order from that hearing stated that Mother was "in a rehabilitation facility at that time." The trial court further found that another hearing was held in the juvenile court matter on March 8, 2023, at which time Mother's counsel withdrew. According to the trial court, "[n]othing in the record indicates that Mother appeared for this court setting." Although this is true, the record is equally unclear concerning when Mother's stay in the rehabilitation facility ended. Mother testified that she had completed alcohol and drug rehabilitation following her January 2023 release from mental health treatment and that she had continued with therapy for some time thereafter. Accordingly, it is somewhat unclear at what point Mother was able to resume participation in the juvenile court litigation such that we are unable to conclude that Mother failed to act with a sense of urgency in this matter.

With respect to Factor (N), regarding whether the parent or anyone residing in the parent's home had shown abuse or neglect toward the Child or any other child or adult, the trial court found that this factor weighed in favor of termination due to the evidence concerning Mother's Adderall abuse resulting in hospitalizations. We agree. The evidence

- 27 -

was undisputed that Mother had experienced a psychotic episode while she had custody of the children and disappeared with them without taking their car seats or her wallet or phone. Fortunately, the Child was unharmed during this incident; however, the Child was determined to be dependent and neglected in Mother's care as a result. Accordingly, this factor weighs in favor of termination.

Regarding factor (O)—whether the parent has ever provided safe and stable care for the child or any child—the trial court found:

> [L]ittle evidence was presented about the stability of Mother's home before Mother's Adderall abuse manifested itself in the form of her Adderall induced psychosis from which she lost custody of both of her children in a dependency and neglect hearing. Such evidence could be considered "ancient history" given Child was seventeen (17) months old when removed from Mother's custody and is four and one half (4 1/2) years old now. However, the fact that Child was found to be dependent and neglected is the best evidence that Mother did not provide safe and stable care for Child.

The court therefore found that this factor favored termination. We agree. The evidence supports the trial court's determination that factor (O) weighs in favor of termination.

As to factor (P), there is no evidence in the record that Mother had demonstrated concern for the Child's basic and specific needs. The trial court found that Mother's "repetitive Adderall abuse, her current living arrangement, her continuing use of marijuana and alcohol . . . and her failure to provide adequate financial support all reflect a lack of understanding" of the Child's needs. The court thus found that factor (P) also weighed in favor of termination. The evidence preponderates in favor of the trial court's findings as to this factor.

Regarding factor (Q)—whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and wherein the child can thrive—the trial court found this factor to be neutral. Although the trial court noted the testimony of Deputy Joyner, who stated that he found Mother's home to be unsanitary in December 2023, the court articulated that Mother had "scoffed" at his account and described her home as "beautiful." The court also noted that no photographic evidence of the condition of Mother's home had been introduced one way or the other. Accordingly, the court determined factor (Q) to be neutral, and the evidence supports this finding. The court found that factor (R)—relative to the physical environment of a parent's home—was "not relevant" for similar reasons. Similar to factor (Q), we determine this factor to be neutral as well.

Concerning factor (S), which addresses a parent's history of providing financial support, the trial court found that this factor weighed in favor of termination because

Mother had never paid child support for the Child, other than her payment of one-half of the Child's day care tuition for three weeks, "despite having ample financial resources to do so." The undisputed evidence supports this finding, and we agree that factor (S) weighs in favor of termination.

Finally, regarding factor (T), relative to Mother's mental and emotional fitness to provide safe and stable care and supervision of the Child, the proof demonstrated that Mother had experienced various periods of inpatient care for her mental health and substance abuse issues, and Mother admitted that the Child would not have been safe in her care during those episodes. The trial court recognized that although Dr. Clement had concluded that Mother was "fit and able to parent," Dr. Clement had also acknowledged that the use of drugs and alcohol could "exacerbate an underlying mental health condition and that an unspecified psychological disorder can go into remission and then reappear." The trial court found that Mother's continued and routine use of marijuana and alcohol caused the court to question her mental and emotional fitness as well as her "ability to have an understanding and appreciation for the adverse consequences that could flow from such behavior." The court therefore determined that this factor weighed in favor of termination. We conclude that the proof supports the trial court's determination.

Considering the entirety of the applicable factors, we conclude that the evidence weighs soundly in favor of terminating Mother's parental rights to the Child. We therefore affirm the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Leah R.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE